**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**SOUTHERN INSURANCE COMPANY**                                               **PLAINTIFF**

**V.**                                       **CIVIL ACTION NO. 2:13cv263-KS-MTP**

**AFFILIATED FM INSURANCE COMPANY,
AND UNIVERSITY OF SOUTHERN
MISSISSIPPI ALUMNI ASSOCIATION**                           **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the Plaintiff Southern Insurance Company's

Motion for Entry of Final Declaratory Judgment and/or Summary Judgment Against

Affiliated FM Insurance Company ("Motion for Summary Judgment") [96] and Combined

Supplement to Motion for Final Declaratory Judgment and/or Summary Judgment as to

Defendants University of Southern Mississippi Alumni Association and Affiliated FM

Insurance Company, which was docketed as a Supplemental Motion ("Supplemental

Motion for Summary Judgment") [116].  Also before the Court is the Motion for Entry of

Final Declaratory Judgment and/or Summary Judgment Against Southern Insurance

Company ("Motion for Summary Judgment") [114] of the Defendants Affiliated FM

Insurance Company ("Affiliated") and University of Southern Mississippi Alumni

Association ("USMAA").  Having considered the submissions of the parties, the record,

and the applicable law, the Court finds that:

1)      Plaintiff's Motion for Summary Judgment [96] should be denied;

2)      Plaintiff's Supplemental Motion for Summary Judgment [116] should be
        denied; and

3)      Affiliated and USMAA's Motion for Summary Judgment [114] should be

granted in part and denied in part.

## BACKGROUND

This declaratory judgment action concerns insurance coverage for damage to the Ogletree House at the University of Southern Mississippi resulting from a February 10, 2013 tornado. There are two insurance policies potentially providing coverage for the damage. Southern Insurance Company ("Southern") issued policy number CMP 5503932 03 (the "Southern Policy") [34], including a building coverage limit of $4,112,000, to USMAA. Affiliated issued policy number GL069 (the "Affiliated Policy") [114-3], including a total limit of liability of $500,000,000, to the University of Southern Mississippi (the "University"). The Ogletree House, which is a building on the campus of the University, is the insured premises under the Southern Policy. All University buildings, including the Ogletree House, are listed as covered properties under the Affiliated Policy.

The University owned the Ogletree House and leased it to USMAA, a Mississippi non-profit corporation, at all times relevant to the Complaint. (*See* Lease [114-4].) The Lease contains the following terms regarding property insurance:

> USM [the University] is the sole owner of The Ogletree House, however, the Alumni Association [USMAA] shall insure The Ogletree House for any and all perils, including, but not limited to, fire, etc. USM shall be listed as an additional insured party under any such policy. Certificates of all policies of insurance shall be delivered to USM upon written request, and the Alumni Association shall provide a 30 day written notification to USM prior to the cancellation thereof.

(Lease [114-4] at § 10.) The University is not listed as an additional insured under the Southern Policy; only USMAA is a named insured. (*See* Southern Policy [34 at ECF p. 16].) Further, USMAA does not appear to be a named insured under the Affiliated

Policy.[1]

Southern and Affiliated exchanged several communications regarding coverage for the damage to the Ogletree House in the months following the loss. Generally, Southern proposed that both insurers pay and adjust the loss on a pro rata basis, while reserving all rights to negotiate or litigate the amounts owed for the claim. (*See* Doc. Nos. [1-7], [1-8].) Affiliated rejected this proposal on the bases that the Lease requires USMAA to obtain insurance for the subject premises and USMAA is not insured by Affiliated. (*See* Doc. Nos. [1-10], [1-11].) Also during this time period, the University contracted with various construction companies, such as Defendant Rolyn Companies, Inc. ("Rolyn"), to repair buildings damaged by the tornado, including the Ogletree House. (*See* Doc. Nos. [1-12], [1-14], [1-15].) Rolyn was initially paid for its work on the campus, excluding work performed to repair the Ogletree House, from insurance proceeds afforded by the Affiliated Policy. (*See* Martinez Aff. [114-5] at ¶ 3.)[2] On June 9, 2013, Rolyn sought payment from Southern in the amount of $837,187 for its construction services pertaining to the Ogletree House. (*See* Doc. No. [1-13]; Final Declaratory Judgment as to Rolyn [75] at ¶ 8.) Southern never paid this sum to Rolyn.

---

[1] The Affiliated Policy lists the following entities as named insureds: the University, "S.M. Educational Building Corporation, the Board of the Mississippi Institutions of Higher Learning [the "Board"], and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds." (Affiliated Policy [114-3 at ECF p. 6].) No party has cited any evidence supporting the contention that USMAA is a subsidiary of the Board or that any named insured owns, controls, or operates USMAA.

[2] Joshua S. Martinez is a general adjuster with FM Global; Affiliated is a member company of FM Global. (*See* Martinez Aff. [114-5] at ¶ 2.)

On November 1, 2013, USMAA submitted sworn proofs of loss to Southern in support of its claims for coverage. (*See* Doc. Nos. [1-17], [1-18], [1-19].) Southern sought $3,246,121 in repair or replacement costs under the building coverage portion of the Southern Policy and $79,153.14 in replacement costs as to personal property. On November 26, 2013, Southern submitted its written response to USMAA's proofs of loss. (*See* Doc. No. [1-21].) Southern rejected the proof of loss relating to USMAA's request for $3,246,121 in building coverage for a host of reasons, including, but not limited to, the "Sworn Statement in Proof of Loss contains incomplete and/or inaccurate statements regarding the amount of other insurance." (Doc. No. [1-21] at p. 6.) However, Southern accepted USMAA's $79,153.14 lost property claim. A check in this amount was enclosed with Southern's letter. (*See* Doc. No. [1-22].)

On December 2, 2013, Southern filed its Complaint for Declaratory Relief ("Complaint") [1] in this Court pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57. The Complaint names Affiliated, Rolyn, and USMAA as Defendants. Subject matter jurisdiction is asserted under Title 28 U.S.C. § 1332 (diversity of citizenship). Southern principally requests that the Court declare it has no obligation under the Southern Policy to pay for any repairs or damage to the Ogletree House. In the alternative, Southern asks that the Court find that the most it can be required to pay for the building claim is a pro rata share based on a comparison of the $4,112,000 limit of the Southern Policy and the $500,000,000 blanket limit of the Affiliated Policy, and that in no event can Southern's share exceed USMAA's proven financial interest in the Ogletree House. The Complaint contains numerous other requested judicial declarations, ranging from "Southern Insurance owes no obligation to pay to Defendant

Rolyn any sum for work Rolyn has or will perform on the Ogletree House with respect to the subject tornado damage," to "USMAA has no claim for personal property of others nor any other claim under the Southern Policy or otherwise." (Compl. [1] at pp. 26, 27.)

Both Affiliated and USMAA (collectively referred to as "Defendants") have answered the Complaint and asserted a counterclaim seeking the following declaratory judgment: "Based on the terms of the Affiliated Policy, any coverage provided by the Southern Policy for the damage to The Ogletree is primary, and the coverage provided by the Affiliated Policy is secondary." (Answer [4] at ¶ 29; Answer [53] at ¶ 28.)[3]  Rolyn has not answered the Complaint.  Nonetheless, it agreed to the entry of a Final Declaratory Judgment [75] providing, *inter alia*, that Southern neither owes nor has ever owed any obligation to pay Rolyn for the repair of the Ogletree House and that Rolyn should be dismissed from the lawsuit.  As a result, Rolyn is no longer a party to this action.  (*See* Final Judgment Pursuant to Rule 54(b) [76].)

At some point after Southern's rejection of USMAA's building coverage claim and the filing of the Complaint [1], the University requested that the damages to the Ogletree House be paid by Affiliated pursuant to the University's overall claim for insurance benefits under the Affiliated Policy.  (*See* Martinez Aff. [114-5] at ¶ 5.)  Affiliated issued payments for repair costs to the University totaling $3,080,932.36 pursuant to this request.  (*See* Martinez Aff. [114-5] at ¶¶ 7-8.)  In July of 2014, USMAA and Affiliated entered into an Assumption of Defense Agreement and Waiver ("Assumption Agreement") [96-5] in light of Affiliated advancing the costs of the repairs to the Ogletree

---

[3] These Defendants are represented by the same legal counsel.

House.  The Assumption Agreement provides in part that USMAA "hereby assigns all rights it has in connection with this claim against its insurer Southern . . . and agrees to remain a party to enforce its rights, whether in contract, tort or in the Declaratory Judgment action . . . ."  (Assumption Agreement [96-5] at ¶ 6.)

Via its summary judgment motions, Southern seeks a declaratory judgment decreeing that USMAA has no claim against it under the Southern Policy, and that Southern has no obligation to make any further payments to USMAA or to repay Affiliated.  Defendants' summary judgment motion requests that the Court declare that Southern is obligated to pay USMAA for the damages to the Ogletree House, or, in the alternative, that the damages are to be paid by Southern and Affiliated on a pro rata basis taking into account the $3,962,662 scheduled value of the Ogletree House and not the total limit of $500,000,000 under the Affiliated Policy.  The Court has fully considered the parties' competing positions and is ready to rule.

## DISCUSSION

**I.    Southern's Motions for Summary Judgment [96], [116][4]**

**A.    Legal Standards**

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[4] The Court also considers the grounds for summary judgment presented in Southern's prior motions directed at USMAA, (*see* Doc. Nos. [55], [83]), which the Court denied as moot and without prejudice in light of the subsequent summary judgment motions filed against USMAA and Affiliated.  (*See* Order [126].)

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5]

Initially, the movant has "the burden of demonstrating the absence of a genuine issue of

material fact." *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012)

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986)). If the movant meets this burden, the nonmovant must go beyond the pleadings

and point out specific facts showing the existence of a genuine issue for trial. *Id.* "An

issue is material if its resolution could affect the outcome of the action." *Sierra Club,

Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting

*Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is

'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the

nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir.

2010) (citation omitted).

The Court is not permitted to make credibility determinations or weigh the

evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quoting *Turner v.

Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). When deciding

whether a genuine fact issue exists, "the court must view the facts and the inferences to

_____

[5] The references to a declaratory judgment in the titles of Plaintiff and Defendants' motions do not require the application of any other procedural rule. *See I.E.C. ex rel. J.R. v. Minneapolis Pub. Sch., SSD No. 1*, 970 F. Supp. 2d 917, 925 (D. Minn. 2013) (providing that neither Fed. R. Civ. P. 57 nor any other rule of civil procedure authorizes a motion for declaratory judgment). Motions for declaratory relief are usually decided under Rule 56. *See, e.g.*, *Enniss Family Realty I, LLC v. Schneider Nat'l Carriers, Inc.*, 916 F. Supp. 2d 702, 711 (S.D. Miss. 2013) (construing a motion seeking declaratory relief as a motion for partial summary judgment); *Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995) ("The only way plaintiffs' motion [seeking a declaratory judgment] can be construed as being consistent with the Federal Rules is to construe it as a motion for summary judgment on an action for a declaratory judgment.").

be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138.  However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).  Summary Judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322).

The substantive law of Mississippi applies in this diversity case.  *See Barden Miss. Gaming Ltd. Liab. Corp. v. Great N. Ins. Co.*, 638 F.3d 476, 478 (5th Cir. 2011). The Mississippi Supreme Court has set forth the following principles of substantive contract law applying to the interpretation of insurance contracts:

> [I]f a contract is clear and unambiguous, then it must be interpreted as written.  A policy must be considered as a whole, with all relevant clauses together.  If a contract contains ambiguous or unclear language, then ambiguities must be resolved in favor of the non-drafting party.  Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage.  However, ambiguities do not exist simply because two parties disagree over the interpretation of a policy. Exclusions and limitations on coverage are also construed in favor of the insured.   Language in exclusionary clauses must be "clear and unmistakable," as those clauses are strictly interpreted.  Nevertheless, "a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured."

*U.S. Fid. & Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 963 (¶ 13) (Miss. 2008) (citations omitted).

**B.    Whether USMAA's Claim for $3,246,121 in Insurance Proceeds Is Excluded Under the Southern Policy as a Matter of Law Due to Affiliated Paying for the Damage to the Ogletree House After Southern Rejected the Claim**

Southern relies upon the following portions of its policy in arguing that it has no

obligation to make any further payments to USMAA:

**4.    Loss Payment**

a.    In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1)    Pay the value of lost or damaged property;

. . . .

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

. . . .

**7.    Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a.    At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

. . . .

e.    Tenants' Improvements and Betterments at:

. . . .

(3)    Nothing if others pay for repairs or replacement.

(Southern Policy [34 at ECF pp. 30, 31, 32].)  According to Southern, the value of

USMAA's claim is nothing and it is not required to make any loss payment to USMAA because Affiliated paid for the repairs to the Ogletree House on behalf of USM. USMAA argues that Southern overlooks the fact that it was forced to seek payment for the repairs from others only after Southern denied the insurance claim. "Southern Insurance Company cannot reject the claim and then use this rejection as the basis for denial of its insured's rights when the insured seeks payment from another source." (USMAA's Resp. to Mot. for SJ [72] at p. 7.) According to USMAA, Southern is pressing a defense created by its own wrongful actions and should be precluded from reducing the insurance claim to zero based on the prior rejection.

In essence, Southern requests that the Court hold as a matter of law that certain valuation provisions of the Southern Policy, having no apparent negative bearing on USMAA's ability to obtain insurance proceeds at the time it submitted sworn proofs of loss in November of 2013, can nonetheless spring into life and preclude coverage after Southern's rejection of the claim results in another insurer stepping in and providing payments in February and October of 2014. (*See* Martinez Aff. [114-5] at ¶ 7.) The Court declines to construe the above-quoted provisions of the Southern Policy so expansively. As previously mentioned, insurance policy exclusions and limitations are to be strictly interpreted in favor of insureds under Mississippi law. *See Martin*, 998 So. 2d at 963 (¶ 13) (citations omitted); *see also Miss. Farm Bureau Mut. Ins. Co. v. Jones*, 754 So. 2d 1203, 1203 (¶ 1) (Miss. 2000) (applying the principle that exclusionary "clauses should be strictly construed against the insurer and in favor of the insured"); *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (¶ 20) (Miss. 2009) ("[A] construction leading to an absurd, harsh or unreasonable result in a contract should be

avoided unless the terms are express and free from doubt.") (citation omitted).  Had

Southern intended for the "[n]othing if others pay for repairs or replacement" section of

its policy (the "Nothing Provision") to apply before *and* after a claim denial, it certainly

could have included policy language to the effect.  (Southern Policy [34 at ECF p. 32].)

For instance, the Southern Policy contains the following exclusion based on

concealment, misrepresentation, or fraud:  "This Coverage Part is void in any case of

fraud by you as it relates to this Coverage Part *at any time*.  It is also void if you or any

other insured, *at any time*, intentionally conceal or misrepresent a material fact . . . ."

(Southern Policy [34 at ECF p. 36]) (emphasis added).  The Court's duty to draw all

reasonable inferences in favor of the nonmovant at the summary judgment stage[6] and

Mississippi's substantive law pertaining to the interpretation of exclusionary insurance

clauses preclude the Court from engrafting "at any time" or any similar language into the

Nothing Provision.

Southern's reliance on an opinion by the United States Court of Appeals for the

Seventh Circuit in support of summary judgment is unavailing.  *See Edgewood Manor*

*Apartment Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761 (7th Cir. 2013).  In

*Edgewood Manor*, the Seventh Circuit took notice of a policy provision containing

language substantially similar to that of the Nothing Provision:  "We will not pay for loss

or damage to tenants' improvements and betterments if others pay for repairs or

_____

[6] *See, e.g.*, *Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014); *Sierra*
*Club, Inc.*, 627 F.3d at 138.  That the Defendants have also moved for summary
judgment does not negate this duty.  "[E]ach motion is evaluated by reading the
evidence and resolving any doubts in favor of the nonmovant."  *Shazor v. Prof'l Transit*
*Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (citation omitted).

replacement." 733 F.3d at 774. However, there was no application of that provision to preclude coverage. The insurer was relying on a separate policy provision to deny payment of replacement-cost proceeds to a property owner who sold the subject premises in an unrepaired state. *See id.* at 773. The Seventh Circuit distinguished the replacement-cost proceeds provision (which applied to the parties' dispute) from the tenants' improvements and betterments provision (which did not apply), and reversed the district court's grant of summary judgment in favor of the insurer. *See id.* at 774-75. Further, the Seventh Circuit's hypothetical consideration of the tenants' improvements and betterments provision did not appear to encompass the factual circumstance of an insurer rejecting a claim for coverage and subsequently contending that the value of the claim is nothing because another insurer stepped in and provided benefits *after* the claim denial. Southern fails to cite, and the Court has not identified any other legal authority referencing a policy provision with identical or substantially similar language.

The parties seem to agree that the purpose of the Nothing Provision is to preclude the possibility of a "windfall,"[7] i.e., a "double recovery"[8] in favor of USMAA. The summary judgement record contains documents indicating that any potential payment by Southern to USMAA for building coverage would ultimately be used to reimburse Affiliated. For instance, the Assumption Agreement provides that USMAA has assigned all of its rights in connection with its claim against Southern to Affiliated. (*See* Assumption Agreement [96-5] at ¶ 6.) Moreover, Affiliated's supplemental

---

[7] (Southern's Resp. to Mot. for SJ [122] at p. 6.)

[8] (Defs.' Rebuttal in Supp. of Mot. for SJ [123] at p. 5.)

-12-

interrogatory responses state in pertinent part:

> [T]o the extent that Affiliated FM is successful in its arguments, the Alumni Association will receive claim proceeds under its policy with Southern. The Alumni Association will pay the University for the repairs performed and the University will repay Afilated [sic] FM for repair funds advanced to the University for payments made in connection with this loss as it pertains to the Ogletree House.

(Doc. No. [96-9 at ECF p. 3].) These particulars, at the very least, create a fact issue precluding the Court from decreeing that USMAA will be unjustly rewarded if the subject claim is not discounted to a value of zero.

Southern's contention that the Assumption Agreement is null and void pursuant to an anti-transfer provision in the Southern Policy does not alter the preceding determination. The provision states in pertinent part: "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." (Southern Policy [34 at ECF p. 7].) First, the Southern Policy gives Southern the option of directly "adjust[ing] losses with the owners of lost or damaged property," and any payment to the owners "will satisfy your [USMAA's] claims . . . ." (Southern Policy [34 at ECF p. 30].) It thus appears that Southern, if it so chose, could directly pay the University for the repairs to the Ogletree House without triggering the anti-transfer provision and thus negating the possibility of any windfall to USMAA.

Second, the clear majority rule is that stipulations in policies requiring the consent of the insurer for assignment only apply to pre-loss assignments. *See* 3 Steven Plitt et al., *Couch on Insurance* § 35:8 (3d ed. 2014) (citing opinions from numerous states, including, but not limited to, Alabama, Arkansas, Iowa, Louisiana, Tennessee, Virginia, and Wisconsin); 17 *Williston on Contracts* § 49:126 (4th ed.) ("Policy provisions

that require the company's consent for assignment of rights are generally enforceable only before a loss occurs . . . .").  The Kentucky Supreme Court has provided a leading justification for this rule:

> [T]he majority rule holds that an anti-assignment clause . . . is unenforceable once an insured occurrence takes place because at that point the insured is entitled to recovery under the policy; that right is a chose in action; a chose in action is a form of personal property; the anti-assignment provision amounts to a restraint upon the alienation of this property right; and, a restraint upon the alienation of property is in opposition to public policy.

*Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 682-83 (Ky. 2012); *see also Bolz v. State Farm Mut. Auto. Ins. Co.*, 274 Kan. 420, 52 P.3d 898, 902, 903-04, 906 (Kan. 2002) (finding an anti-transfer clause to be unenforceable in part because a post-loss assignment cannot increase an insurer's risk of liability) (citations omitted). Southern does not cite any Mississippi appellate decision considering this issue. However, in one of the district court opinions leading to the above-referenced Seventh Circuit ruling, the court took notice of the majority rule and predicted that the Mississippi Supreme Court would not enforce a "no-transfer clause" with respect to a purported assignment of insurance proceeds.  *Edgewood Manor Apartment Homes LLC v. RSUI Indem. Co.*, 782 F. Supp. 2d 716, 735-37 (E.D. Wis. 2011).[9]  This Court has failed to identify any Mississippi Supreme Court decision considering the enforceability of an anti-transfer provision in relation to a post-loss assignment.  Nonetheless, there are opinions from Mississippi's highest court finding such provisions to be less than sacrosanct.  *See Camden Fire Ins. Ass'n v. Koch*, 216 Miss. 576, 63 So. 2d 103, 106

---

[9] The Seventh Circuit did not specifically consider this issue because proceedings occurring subsequent to the district court's ruling revealed the purported assignment to be nonexistent.  *Edgewood Manor*, 733 F.3d at 768, 771.

(Miss. 1953) (providing that certain acts by an agent "had the effect by estoppel of waiving the provision that the assignment would not be valid except with the written consent of the companies"); *Aetna Ins. Co. v. Smith, McKinnon & Son*, 117 Miss. 327, 78 So. 289, 290 (Miss. 1918) (strictly construing an anti-assignment clause in favor of the insured and holding that the assignment of the policy as collateral security for debt did not void coverage). Based on the preceding authorities, the Court predicts that the Assumption Agreement, executed more than one (1) year after the date of loss, would not be deemed unenforceable pursuant to the Southern Policy's anti-transfer provision under Mississippi law.

Ultimately, the Court denies Southern's request for summary judgment against USMAA based on Affiliated providing reimbursement for the damage to the Ogletree House after Southern rejected USMAA's claim for building coverage.

**C.     Whether Southern Is Entitled to Summary Judgment Against Affiliated Pursuant to the Voluntary Payment Doctrine**

Southern contends that Affiliated's unilateral and voluntary payment for repairs to the Ogletree House precludes it from directly or indirectly seeking reimbursement and bars a declaratory judgment in Affiliated's favor. The Mississippi Supreme Court has described the voluntary payment doctrine, i.e., volunteer rule, as follows:

> [A] voluntary payment can not be recovered back, and a voluntary payment within the meaning of this rule is a payment made without compulsion, fraud, mistake of fact, or agreement to repay a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand.

*Glantz Contracting Co. v. Gen. Elec. Co.*, 379 So. 2d 912, 917 (Miss 1980) (quoting

*McDaniel Bros. Constr. Co. v. Burk-Hallman Co.*, 253 Miss. 417, 175 So. 2d 603, 605

-15-

(1965)).  A volunteer in this context is "[a] stranger or intermeddler who has no interest to protect and is under no legal or moral obligation to pay."  *Guidant Mut. Ins. Co. v. Indem. Ins. Co. of N. Am.*, 13 So. 3d 1270, 1279 (¶ 27) (Miss. 2009) (quoting *State Farm Mut. Auto. Ins. Co. v. Allstate Ins. Co.*, 255 So. 2d 667, 668 (Miss. 1971)).  Conversely, one who pays under compulsion, by accident or mistake, or pursuant to a legal obligation will not be barred from seeking reimbursement.  *Genesis Ins. Co. v. Wausau Ins. Cos.*, 343 F.3d 733, 738 (5th Cir. 2003) (citations omitted).  Whether a payment was made on a voluntary basis turns on the facts of each "case and whether such facts indicate an intent on the part of the payor to waive his rights."  *Glantz Contracting Co.*, 379 So. 2d at 917-18.

The facts of this case lead the Court to conclude that Affiliated was not acting as a mere volunteer in paying for repairs to the Ogletree House.  It is undisputed that the Ogletree House is a covered property under the Affiliated Policy.  Further, the University is an insured under this policy of insurance.  Viewing these facts in the nonmovant's favor, the Court finds that Affiliated responded to the University's request for payment[10] pursuant to "a legal contractual obligation" and not as a stranger or intermeddler.  *Guidant Mut. Ins. Co.*, 13 So. 3d at 1279-80 (¶¶ 27-30), 1282 (¶¶ 37-38) (rejecting an application of the voluntary payment doctrine in a dispute between insurers regarding primary versus excess coverage); *cf. St. Paul Fire & Marine Ins. Co. v. State Volunteer Mut. Ins. Co.*, No. Civ.A. 2:97CV47-D-B, 1998 WL 173222, at *2 (N.D. Miss. Feb. 23, 1998) (holding that an insurer obligated to make payments under its insurance contract

---

[10] (*See* Martinez Aff. [114-5] at ¶¶ 5, 7-8.)

could not be deemed a "mere volunteer" and could seek contribution under a theory of equitable subrogation), *aff'd*, 212 F.3d 595, 2000 WL 423419 (5th Cir. Apr. 5, 2000).

The timing of Affiliated's payments also militates against any conclusion that it is presently barred from asserting that the Southern Policy is primary or that coverage should be determined on a pro rata basis. Affiliated issued payments to the University in February and October of 2014. (*See* Martinez Aff. [114-5] at ¶ 7.) By that time, Southern had unequivocally rejected USMAA's request for building coverage,[11] and filed this action principally seeking a declaration that it owed nothing for the repairs to the Ogletree House. (*See* Compl. [1].) The Mississippi Supreme Court has applied the following rule under analogous circumstances: "The majority of cases now recognize the undesirability of rewarding the insurer who refuses to honor its contractual obligations, and hold that payment by an insurer which properly undertakes a burden of settlement or defense does not render it a volunteer, not entitled to recover." *Guidant Mut. Ins. Co.*, 13 So. 3d at 1280 (¶ 29) (quoting *State Farm Mut. Auto. Ins. Co.*, 255 So. 2d at 669); *see also Travelers Prop. Cas. Co. of Am. v. Federated Rural Elec. Ins. Exch.*, No. 3:08cv83, 2009 WL 2900027, at *7 (S.D. Miss. Sept. 3, 2009) (providing that this exception to the voluntary payment doctrine reduces gamesmanship between insurers at the expense of insureds) (citing *Guidant Mut. Ins. Co.*, 13 So. 3d 1270; *Couch on Insurance* § 218:27). The record reflects an initial game of chicken between Southern and Affiliated regarding responsibility for the repairs to the Ogletree House. The Court declines to issue a summary judgment ruling penalizing Affiliated for stopping

---

[11] (*See* Doc. No. [1-21] at p. 6.)

the game and reimbursing its insured for these repairs *after* the issue of primary versus excess coverage was placed before the Court in this declaratory judgment action. *Cf. Miss. Farm Bureau Cas. Ins. Co. v. Amerisure Ins. Co.*, 3:11cv706, 2013 WL 286364, at *8 (S.D. Miss. Jan. 24, 2013) (finding the existence of a voluntary payment partially because an insurer failed to seek declaratory relief prior to providing insurance benefits).

Southern's principal authority in support of the volunteer rule fails to compel a grant of summary judgment in its favor. *See Genesis Ins. Co.*, 343 F.3d 733. First, the Fifth Circuit vacated the district court's grant of summary judgment based on the voluntary payment doctrine. *See id.* at 736, 741. Genesis Insurance Company ("Genesis"), who issued a comprehensive general liability policy to The President Casino ("President"), filed a declaratory judgment action against Wausau Insurance Companies ("Wausau"), who issued a business automobile policy to President, seeking a declaration that the Wausau policy covered all claims at issue in a separate lawsuit brought by Edith Baker, who suffered significant injuries due to being struck by a casino-owned shuttle bus. *See id.* at 734. The Baker lawsuit eventually settled with both insurers contributing funds toward the settlement. *See id.* at 735. The district court subsequently granted summary judgment in favor Wausau, finding that Genesis could not seek reimbursement from Wausau because of the voluntary settlement of the action brought by Baker. *See id.* The Fifth Circuit vacated this ruling because fact issues existed regarding whether an agreement to litigate coverage following settlement existed between the parties. *See id.* at 737-38. "A mutual agreement between . . . [the parties] to litigate their respective liabilities among themselves after settling the Baker

litigation would preclude the application of the volunteer doctrine." *Id.* at 736. (citations

omitted). No agreement between Southern and Affiliated to litigate coverage has been

brought to the Court's attention. However, it would have been an exercise in futility for

Affiliated to seek such an agreement at the time it reimbursed the University because

the parties were already litigating the issue of coverage for damage to the Ogletree

House in this action.

Second, an absence of on-point precedent from the Mississippi Supreme Court

largely contributed to the Fifth Circuit's additional conclusion that Genesis's settlement

payment was not compelled for purposes of the volunteer rule. The Fifth Circuit

explained:

> [N]one of the Mississippi cases address the issue of compulsion issue apart
> from its particular factual context. Accordingly, we enlist the assistance of
> cases from other jurisdictions and the legal literature in an attempt to surmise
> whether the Mississippi Supreme Court, as a matter of law, would apply the
> voluntary payment doctrine in the undisputed factual circumstances
> surrounding the settlement.
>
> . . . .
>
> [W]hen our jurisdiction exists through diversity, we feel compelled to tread
> lightly and allow the state court to take the first step in developing new
> doctrines. We therefore decline to make a predictive statement on
> Mississippi's behalf approving of and applying an exception for those who
> pursue their available legal remedies and yet in good faith make what is
> alleged to be an unjustly demanded payment in their best interest.

*Id.* at 739, 740 (citations omitted). *Guidant*'s subsequent rejection of the volunteer rule

in a dispute where one insurer settled a claim after another refused to pay obviates the

need to rely on federal predictions of state law. *Cf. Travelers Prop. Cas. Co. of Am.*,

2009 WL 2900027, at *1, 4, 5 (reconsidering its prior application of the volunteer rule

pursuant to *Genesis* in light of *Guidant*'s clarification of the law); Jeffrey Jackson,

*Mississippi Insurance Law and Practice* § 14:3 (2014) (noting that *Guidant* offers a

"more liberal approach to the volunteer payment doctrine" than federal precedent;

"where an insurer makes a settlement owed at least in part by another, state law should

not reward the insurer that refuses to participate in the settlement").  The rulings of

Mississippi's highest court on issues of substantive law are controlling in this diversity

action.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188

(1938).

Southern's attempt at distinguishing *Guidant* falls short.  Southern contends that

*Guidant* is inapposite to this first-party case because it involved third-party liability

insurance and the attendant fiduciary duty a liability insurer owes its insured.  If *Guidant*

is distinguishable on this basis, then so is *Genesis*, which also involved a dispute over

liability insurance.  More important, Southern fails to cite any authority holding that a

payment made pursuant to a legal obligation negates the volunteer rule only when a

fiduciary relationship, as opposed to a mere contractual agreement, gives rise to the

obligation.  *Cf. Nat'l Grange Mut. Ins. Co. v. Firemen's Ins. Co. of Newark, N.J.*, 310

S.C. 116, 425 S.E.2d 754, 757 (S.C. Ct. App. 1992) (ruling that an insurer's payment for

fire damage under a homeowner's policy did not render it a volunteer and preclude an

action for contribution).  Accordingly, Southern's request for summary judgment against

Affiliated pursuant to the voluntary payment doctrine is denied.

### D.    Summation and Attorney's Fees

The Court rejects Southern's request for a declaratory judgment at the summary

judgment stage decreeing that it owes nothing to USMAA under the Southern Policy.

The Court also does not find that all issues of valuation and primary versus secondary

coverage as between Southern and Affiliated have been rendered moot by Affiliated's voluntary payment of insurance proceeds. Furthermore, Southern's convoluted and legally bare request for attorney's fees against Affiliated is denied.

## II.    Defendants' Motion for Summary Judgment [114]

As an initial matter, the Court denies the Defendants' request for an order granting them attorney's fees and requiring Southern to reimburse Affiliated "for damages that should have been covered under the Southern Policy." (Defs.' Rebuttal Brief in Supp. of Mot. for SJ [123] at pp. 10-11.)  Defendants fail to offer any facts or legal grounds in support of their request for attorney's fees.  In addition, neither the Defendants' initial briefing in support of summary judgment nor their counterclaims affirmatively demand damages or attorney's fees.  The Court typically does not entertain "arguments raised for the first time in a reply brief."  *United States v. Bejarano*, 751 F.3d 280, 287 n.5 (5th Cir. 2014) (citation omitted).  *A fortiori* the Court declines to award monetary relief not claimed in a pleading.  *Cf. Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (providing that a claim raised for the first time in opposition to a summary judgment motion is not properly before a court) (citation omitted).[12]  The Court now addresses the Defendants' requests for declaratory relief encompassed by their pleadings and urged in their initial brief in support of summary

---

[12] Nothing said here precludes USMAA, pursuant to its obligations under the Assumption Agreement [96-5], from reimbursing Affiliated with insurance proceeds it may ultimately receive from Southern.  Moreover, the absence of a request for damages in either USMAA or Affiliated's counterclaim does not doom their pleas for a declaratory judgment.  The Declaratory Judgment Act enables a litigant to obtain "equitable relief when legal relief is not yet available . . . ."  *Venator Group Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 839-40 (5th Cir. 2003) (citing 28 U.S.C. § 2201).

judgment.

### A. Whether the Southern Policy Provides Primary Coverage for the Loss or Whether Payment for the Loss Must Be Determined on a Pro Rata Basis

Defendants state that "[t]he dispute here is whether the Southern policy should pay its share for the damages to the building . . . in whole, or its true pro rata share." (Defs.' Mem. Brief in Supp. of Mot. for SJ [115] at p. 11.)  In response, Southern chiefly argues that it owes nothing further pursuant to the valuation provisions of its policy and Affiliated's voluntary payment for repairs to the Ogletree House.  The Court has rejected Southern's requests for summary judgment against USMAA and Affiliated on those grounds.  As a result, only Southern's alternative contention that coverage is to be determined on a pro rata basis because the two policies contain mutually repugnant other insurance provisions need be addressed in this section of the Court's opinion.

Insurance policies typically contain three types of clauses pertaining to other insurance:  escape, excess, and pro rata clauses.  *See EMJ Corp. v. Hudson Specialty Ins. Co.*, No. 2:11cv228, 2015 WL 1088082, at *8 (N.D. Miss. Mar. 11, 2015) (quoting *Farmers Ins. Exch. v. Hartford Cas. Ins. Co.*, 907 F. Supp. 234, 237 (S.D. Miss. 1995)).

> Escape clauses provide that the policy affords no coverage at all when there is other valid and collectible insurance. Excess clauses provide that the insurer's liability shall be only the amount by which the loss exceeds the coverage of all other valid and collectible insurance, up to the limits of the excess policy. And prorata clauses provide that the insurer will pay its prorata share of the loss, usually in the proportion to which the limits of its policy bear to the aggregate limits of all valid and collectible insurance.

*Id.*  In *Travelers Indemnity Co. v. Chappell*, 246 So. 2d 498 (Miss. 1971), the Mississippi Supreme Court adopted the majority view that when the other insurance clauses of two policies conflict and render neither policy primary, the clauses are "mutually repugnant

and must be disregarded." *Chappell*, 246 So. 2d at 504 (citations omitted). Payment for a covered loss should not be avoided or defeated by a circular bout of finger-pointing between insurers. *See id.* at 501-03. "When competing insurance policies each contain conflicting 'other insurance' clauses or 'excess coverage' clauses, the clauses shall not be applied and benefits under the policies shall instead be pro rated according to the coverage limits of each policy." *Allstate Ins. Co. v. Chicago Ins. Co.*, 676 So. 2d 271, 275 (Miss. 1996).

The Southern Policy contains the following other insurance clauses:

1.   You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2.   If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

(Southern Policy [34 at ECF p. 36].) In turn, the Affiliated Policy provides in pertinent part:

If there is other insurance covering the same loss or damage that is covered:

**a)** Under this policy; and

**b)** Any other policy;

Then this insurance will apply only as excess and in no event as contributing insurance, and then only after all other insurance has been exhausted, whether or not such insurance is collectible.

(Affiliated Policy [114-3 at ECF p. 38].)

The pro rata clause of the Southern Policy, sub-clause 1, appears inapplicable because no party has shown that USMAA is the named insured under any other policy of insurance providing coverage for the Ogletree House.  Conversely, the excess clause, sub-clause 2, squarely points to the Affiliated Policy since the Ogletree House is a covered property under both policies; each policy provides coverage for direct physical loss or damage; and, both policies were in effect at the time of the loss, February 10, 2013.  (*Compare* Southern Policy [34 at ECF pp. 3, 17, 21], *with* Affiliated Policy [114-3 at ECF pp. 4, 6, 19, 57].)  The excess clause of the Affiliated Policy points to the Southern Policy for these same reasons.  As a result, the "clauses are considered mutually repugnant and are ignored."  *Grange Mut. Cas. Co. v. U.S. Fid. & Guar. Co.*, 853 So. 2d 1187, 1191 (¶ 7) (Miss. 2003) (citing *Chicago Ins. Co.*, 676 So. 2d at 275).

Defendants argue that the cancellation of other insurance clauses requires both policies to insure the same named insured.  The Court disagrees.  The factual circumstance of two insurance policies providing coverage to the same individual or entity certainly appears to be present in numerous Mississippi cases finding other insurance clauses to be mutually repugnant.  *See, e.g.*, *EMJ Corp.*, 2015 WL 1088082, at *6, 10; *Titan Indem. Co. v. Am. Justice Ins. Reciprocal*, 758 So. 2d 1037, 1039-40 (¶ 2), 1042 (¶ 21) (Miss. Ct. App. 2000); *but cf. Grange Mut. Cas. Co.*, 853 So. 2d at 1191 (¶¶ 7-8) (rejecting a priority of coverage argument based on an insured being specifically named in one policy and falling under another policy's "member of the household" provision in disregarding conflicting excess clauses).  However, the Court finds no explicit same named insured requirement in *Chappell*, adopting the rule of mutual repugnancy, or any post-*Chappell* authority applying Mississippi law.  The

general rule is that the liability of two "insurers under overlapping coverage policies is to be governed by the intent of the insurers as manifested by the terms of the policies which they have issued." *Liberty Mut. Ins. Co. v. U.S. Fid. & Guar. Ins. Co.*, 756 F. Supp. 953, 956 (S.D. Miss. 1990) (quoting *Blue Cross & Blue Shield of Miss. v. Larson*, 485 So. 2d 1071, 1074 (Miss. 1986)). The terms of the excess clauses in the Southern Policy and Affiliated Policy evidence no intent for their applicability to turn on the identity of the named insured under another insurance policy. Moreover, enforcing conflicting other insurance clauses so as to "allow both insurers to avoid liability completely" for the same covered loss constitutes unsound public policy regardless of whether the same insured is named under the competing policies. *Cf. Chappell*, 246 So. 2d at 503 (explaining the rationale for the majority rule).

Defendants also request that the Court look to the terms of the Lease, which clearly requires USMAA to obtain insurance for the Ogletree House and arguably places the responsibility for extraordinary repairs on USMAA, in determining the priority of coverage. (*See* Lease [114-4] at §§ 8, 10.) "Under Mississippi law, the construction of an insurance contract is limited to examining the policy." *EMJ Corp.*, 2015 WL 1088082, at *5 (quoting *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 555 (5th Cir. 1998)). A court should only consider extrinsic evidence in determining the intent of the contracting parties if the terms of the policy are ambiguous and unclear based on a review of the policy as a whole. *See id.* The Court finds the excess clauses of the Southern Policy and Affiliated Policy to be unambiguous. Furthermore, neither policy references the Lease in its other insurance provisions. Consequently, the Lease between USMAA and the University is irrelevant to the matter of priority of coverage.

*See id.* at 5-6 (refusing to consider an underlying subcontract agreement in determining the extent of coverage as between two insurers where the policy terms were unambiguous and did not incorporate by reference the agreement); *Chicago Ins. Co.*, 676 So. 2d at 274-75 (applying the rule of repugnancy notwithstanding one insurer's argument that extrinsic facts surrounding the purchase of its policy showed it only provided excess coverage).

The mutually repugnant terms of the excess clauses of the Southern Policy and Affilated Policy prevent the Court from decreeing either one to be primary with respect to coverage for the damage to the Ogletree House. Thus, coverage must be determined on a pro rata basis. *See, e.g.*, *Grange Mut. Cas. Co.*, 853 So. 2d at 1191 (¶ 7); *Chicago Ins. Co.*, 676 So. 2d at 275; *Titan Indem. Co.*, 758 So. 2d at 1042 (¶ 21).

**B.** **Whether the Scheduled Value of the Ogletree House or the Total Limit of the Affiliated Policy Is to Be Used in the Pro Rata Determination**

Not surprisingly, the parties also disagree over the proper pro rata calculation. Defendants argue that the scheduled value of the Ogletree House, $3,962,662, should be used in determining the insurers' respective liabilities for the loss. Southern contends that $500,000,000, the total limit of liability under the Affiliated Policy, is the correct sum. The following undisputed facts are pertinent to the pro rata determination. The Southern Policy specifies a building coverage limit of $4,112,000. (*See* Southern Policy [34 at ECF p. 18].) The Affiliated Policy contains a total liability limit of $500,000,000. (*See* Affiliated Policy [114-3 at ECF p. 6].) The $500,000,000 limit applies to the subject loss. (*See* Affiliated's Resp. to Pl.'s Req. for Admissions [122-4] at p. 2.) The Affiliated Policy does not contain a sub-limit of liability for the Ogletree

House.  (*See* Affiliated's Resp. to Pl.'s Req. for Admissions [122-4] at pp. 2-3.)  A Schedule of Values pertaining to the various buildings and facilities insured under the Affiliated Policy lists a $3,962,662 value for the Ogletree House.  (*See* Affiliated Policy [114-3 at ECF p. 57].)

The Mississippi Supreme Court has unequivocally stated that "the coverage limits of each policy" are to be used in apportioning coverage responsibilities after other insurance clauses have been deemed mutually repugnant.  *Grange Mut. Cas. Co.*, 853 So. 2d at 1191 (¶ 7) (citing *Chicago Ins. Co.*, 676 So. 2d at 275).  In a pro rata determination using coverage limits, each insurer's level of responsibility for the loss is calculated by dividing its policy limit by the total limits of all applicable policies.  *See EMJ Corp.*, 2015 WL 1088082, at *12; Jackson, *supra*, § 16:7.  Applying this formula to the undisputed coverage limits at issue in this case, $4,112,000 as to Southern and $500,000,000 as to Affiliated, results in the following apportionment for USMAA's $3,246,121 building damage claim:  Southern is to pay $26,478.34 and Affiliated is to pay $3,219,642.66.

The only legal authority Defendants cite in support of using the scheduled value of the Ogletree House in the pro rata calculation is Mississippi's valued policy statue, section 83-13-5 of the Mississippi Code.  The statute provides that when an insured premises is "totally destroyed by fire," an insurer may not deny that the building or structure was worth "the full value upon which the insurance is calculated, and the measure of damages shall be the amount for which the buildings and structures were insured."  Miss. Code Ann. § 83-13-5.  The Ogletree House was partially damaged by a tornado and not totally destroyed by a fire.  Therefore, section 83-13-5 has no

application to this case.  *Cf. Liberty Mut. Ins. Co. v. Lamb*, No. 1:06cv976, 2008 WL 625021, at *4-5 (S.D. Miss. 2008) (finding section 83-13-5 inapplicable where the insured premises suffered a total loss due to a combination of fire and flooding).

Defendants assert that a calculation resulting in Southern's contribution being *de minimis* "flies in the face of the purpose of the law governing mutual repugnancy and *pro rata* sharing of the loss."  (Defs.' Mem. Brief in Supp. of Mot. for SJ [115] at p. 22.)  The purpose of the rule of repugnancy is to ensure that a covered loss is not reduced to zero by two insurers asserting that their respective policies only provide excess coverage. *See Chappell*, 246 So. 2d at 503.  Requiring one insurer to pay almost the entirety of the loss in comparison to the other insurer's contribution does not run afoul of this policy goal.  One could certainly argue that apportioning the loss between Southern and Affiliated under an "equal shares" approach may produce a fairer result given the number of buildings insured under the Affiliated Policy.  *Am. Cas. Co. of Reading, Pa. v. PHICO Ins. Co.*, 549 Pa. 682, 702 A.2d 1050, 1053 (Pa. 1997) (each insurer contributes an equal sum up to the limits of the lesser policy with any remaining portion of the loss to be paid by the insurer with the greater policy limit).  However, Mississippi has adopted the pro rata method based on policy limits.  *See Titan Indem. Co.*, 758 So. 2d at 1040 (¶ 11) (citing *Chappell*, 246 So. 2d at 506).  The Court cannot ignore this state precedent in this diversity action.  *See Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 411 (5th Cir. 2007) ("We have long followed the principle that we will not create innovative theories of recovery or defense under local law, but will rather merely apply it as it currently exists.") (citation omitted).

Finally, the distinction between a blanket policy and a scheduled policy, as discussed in *Gulfport-Brittany, LLC v. RSUI Indemnity Co.*, No. 1:07cv103, 2008 WL 4951468 (S.D. Miss. Nov. 7, 2008), *aff'd*, 339 Fed. Appx. 413 (5th Cir. 2009), supports Southern's proposed pro rata calculation.[13]  In *Gulfport-Brittany*, the district court considered whether an insurer's liability for property damage to an apartment complex was capped at a scheduled sub-limit of $2,458,014.00 or subject to overall occurrence limits of $140,000,000.00.  *See id.* at *1.  The court provided as follows in addressing the matter:

> Though Mississippi courts have not addressed this specific issue, courts in other jurisdictions have determined that where a policy contains a scheduled limit of liability endorsement, and the description of the premises is listed as per schedule on file with the company, a scheduled-rather than blanket-policy is created, and the insurer's liability as to that particular property is limited to the value shown on the statement of values on file with the company. *See Knowlton Specialty Papers, Inc. v. Royal Surplus Lines Ins. Co.*, No. 03-cv-705 (N.D.N.Y.2003*), available at* 18-2 Mealey's Litig. Rep. Ins. 7 (2003), *aff'd*,112 Fed. App'x 121 (2d Cir.2004); *see also Reliance Nat'l Indemnity Co. v. Lexington Ins. Co.*, No. 01 C 3369, 2002 WL 31409576, at *8 (N.D.Ill.2002)(examining a nearly identical scheduled limit of liability endorsement and finding that "[b]ecause the Lexington Policy separately scheduled different items of property [on its Statement of Values on file with the Company], it is a scheduled policy with specific limits for particular items and not a blanket coverage policy."); *Fair Grounds Corp. v. Travelers Indemnity Company of Illinois*, 742 So.2d 1069, 1071 (La.Ct.App.1999)(examining a nearly identical scheduled limit of liability endorsement and stating "[i]t is undisputed here that the above references to 'statements of values on file with us' mean that these were scheduled, rather than blanket, policies."); *Anderson Mattress Company, Inc. v. First State Ins. Co.*, 617 N.E.2d 932, 935-38 (Ind.Ct.App.1993). While not controlling, the Court finds these authorities persuasive.

*Id.* at *3 (footnote omitted).  Particularly in light of the Scheduled Limit of Liability

---

[13] A scheduled policy supplies separate coverage limits for each insured premises, whereas a blanket policy provides one overall limit for the properties as a whole.  *See Gulfport-Brittany, LLC*, 2008 WL 4951468, at *3 n.3 (citation omitted).

endorsement, which limited liability to "100% of the individually stated value for each scheduled item of property . . . as shown on the latest Statement of Values," the court found the subject policy to be a scheduled policy, resulting in the insurer's liability for the damage to the apartment complex being capped at $2,458,014.00. *Id.* at *4-5. As to this case, the Affiliated Policy does not contain a scheduled limit of liability endorsement. (*See* Affiliated's Resp. to Pl.'s Req. for Admissions [122-4] at p. 1].) Affiliated has also admitted that the $500,000,000 limit applies to the subject loss. (*See* Affiliated's Resp. to Pl.'s Req. for Admissions [122-4] at p. 2].) Furthermore, Affiliated fails to identify any provision of its policy characterizing the various property values listed in the Schedule of Values as separate limits of insurance. *Cf. Reliance Ins. Co. v. Orleans Parish Sch. Bd.*, 322 F.2d 803, 805-07 (5th Cir. 1963) (affirming the trial court's finding that the subject policy was a blanket policy even though an endorsement incorporated by reference a Statement of Values that separately listed values for insured properties). Therefore, the total or blanket $500,000,000 limit of the Affiliated Policy controls.

## CONCLUSION

Southern is not entitled to summary judgment against either USMAA or Affiliated. USMAA and Affiliated are partially entitled to summary judgment. Any positions presented by the parties' summary judgment filings that were not specifically addressed above have, nonetheless, been considered and fail to alter the Court's rulings.

IT IS THEREFORE ORDERED AND ADJUDGED that the Plaintiff's Motion for Summary Judgment [96] is denied.

IT IS FURTHER ORDERED AND ADJUDGED that the Plaintiff's Supplemental

Motion for Summary Judgment [116] is denied.

IT IS FURTHER ORDERED AND ADJUDGED that the Defendants' Motion for Summary Judgment [114] is granted in part and denied in part as outlined above and in accordance with the following determinations:  i) the excess insurance clauses of the Southern Policy and Affiliated Policy are mutually repugnant and thus inoperable; ii) coverage for damage to the Ogletree House is to be determined on a pro rata basis according to the coverage limits of each policy; and iii) the $500,000,000 total limit of the Affiliated Policy is to be used in the pro rata calculation.

SO ORDERED AND ADJUDGED this the 13th day of April, 2015.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE